IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CRAIG S. A.,[1]

        Plaintiff,

vs.

COMMISSIONER of SOCIAL SECURITY,

        Defendant.

Civil No. 17-cv-694-JPG-CJP

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in December 2013 alleging disability beginning on May 24, 2013. After holding an evidentiary hearing, Administrative Law Judge (ALJ) Jason R. Yoder denied the application in a written decision dated February 10, 2016. (Tr. 27-40.) The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1.) Administrative remedies have been exhausted, and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1.     The ALJ erroneously found that Plaintiff's right knee arthroscopy in July 2013 was unrelated to his total knee arthroplasty in the same knee on November 14, 2014. If he had properly considered the evidence, he should have found that Plaintiff's injury to his right knee in May 2013 caused one continuous period of disability from May 2013 through at least October 2015.

---

[1] The Court will not use plaintiff's full name in this Memorandum and Order in order to protect his privacy. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

      2.      The ALJ erred in the weight he afforded to the opinion of Plaintiff's primary care physician, Dr. Walls, and to the opinions of the reviewing doctors.

## Applicable Legal Standards

To qualify for benefits, a claimant must be "disabled" pursuant to the Social Security Act. The Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must result from a medically demonstrable abnormality. 42 U.S.C. § 423(d)(3). Moreover, the impairment must prevent the Plaintiff from engaging in significant physical or mental work activity done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations require an ALJ to ask five questions when determining whether a claimant is disabled. The first three questions are simple: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe physical or mental impairment; and (3) whether that impairment meets or is equivalent to one of the listed impairments that the regulations acknowledge to be conclusively disabling. 20 C.F.R. § 404.1520(a)(4); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). If the answers to these questions are "yes," then the ALJ should find that the claimant is disabled. *Id.*

At times, an ALJ may find that the claimant is unemployed and has a serious impairment, but that the impairment is neither listed in nor equivalent to the impairments in the regulations—failing at step three. If this happens, then the ALJ must ask a fourth question: (4) whether the claimant is able to perform his or her previous work. *Id.* If the claimant is not able

to, then the burden shifts to the Commissioner to answer a fifth and final question: (5) whether the claimant is capable of performing *any* work within the economy, in light of the claimant's age, education, and work experience. If the claimant cannot, then the ALJ should find the claimant to be disabled. *Id*.; *see also Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

A claimant may appeal the final decision of the Social Security Administration to this Court, but the scope of review here is limited: while the Court must ensure that the ALJ did not make any errors of law, the ALJ's findings of fact are conclusive as long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable person would find sufficient to support a decision. *Weatherbee*, 649 F.3d at 568 (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The Court takes into account the entire administrative record when reviewing for substantial evidence, but it does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). But even though this judicial review is limited, the Court should not and does not act as a rubber stamp for the Commissioner. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

### **The Decision of the ALJ**

ALJ Yoder followed the five-step analytical framework described above. He determined that Plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. He was insured for DIB through December 31, 2018. He found that Plaintiff had severe impairments of right knee degenerative joint disease, mild right hip osteoarthritis, bilateral carpal tunnel syndrome, diabetes, sleep apnea, obesity, and compression fracture at L1, which did not

meet or equal a listed impairment.

The ALJ found that Plaintiff had the residual functional capacity (RFC) to perform work at the light exertional level, limited to no operation of foot controls or push/pull with the right lower extremity; no climbing of ladders, ropes, or scaffolding; occasional climbing of ramps or stairs; occasional balancing, stooping, kneeling, crouching and crawling; no concentrated exposure to workplace hazards; and only frequent use of the upper extremities for pushing, pulling, operating hand controls, handling, fine fingering, and feeling.

Based on the testimony of a vocational expert (VE), the ALJ found that Plaintiff was not disabled because he was able to do his past relevant work as a bottle-house quality control technician (beer bottler).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff, which mainly concern his right knee.

### 1. Agency Forms

Plaintiff was born in 1957 and was almost 56 years old on the alleged onset date. (Tr. 222.) He had worked as a beer bottler from 1996 through the alleged date of onset. (Tr. 225.)

Plaintiff submitted a Function Report in February 2014 in which he said that his days were spent resting and napping, and his nights were spent tossing and turning. (Tr. 244.) The only household chore he did was folding clothes. (Tr. 246.) He could walk 25 yards. (Tr. 249.)

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the January 2016 evidentiary hearing. (Tr. 48.)

Plaintiff injured his right knee in May 2013. He had arthroscopic surgery, but it did not work. (Tr. 58-59.) His knee kept getting worse after the surgery. The doctor tried injections. Ultimately, he had a full knee replacement in November 2014. He progressed very slowly after that. Walking caused a burning, grinding sensation, especially if he was on his feet for over half an hour. (Tr. 61-64.) He still had difficulty going up stairs. His knee only bends to 90 degrees. (Tr. 68.) He applied ice to his knee three times a day and used an exercise bike in the morning to loosen his knee up. He took 800 milligrams of ibuprofen three times a day. (Tr. 69.)

The ALJ asked Plaintiff about a statement in a medical record that he had used a jackhammer all day the prior Sunday. Plaintiff testified that this was not accurate. His son was using a jackhammer, and Plaintiff stopped by his house. Plaintiff had never used a jackhammer before, so he held it for a little while. He did not use it all day. (Tr. 83-84.)

A VE also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment. The VE testified that this person could do Plaintiff's past work. (Tr. 87-89.)

### 3. Medical Treatment

Plaintiff saw Dr. James Rushford, an orthopedic surgeon, for right knee pain in July 2013. His primary care physician, Dr. Walls, referred him. He had injured his knee in May getting up from the floor to answer the phone. An MRI showed arthritic changes grade 1 to 2 in the medial tibiofemoral compartment with displaced meniscus; a small effusion; possible rupturing Baker's cyst; and grade 4 chondromalacia patellae. (Tr. 344-46.)

On July 30, 2013, Dr. Rushford performed arthroscopic surgery of the right knee, consisting of resection of a lateral meniscal tear, chondroplasty of the left medial femoral condyle,

5

and plica resection. Two weeks later, he had some pain which he described as a throbbing sensation, but he did not require pain medication. His stitches were removed. His gait was nonantalgic with no assistive device. Dr. Rushford gave him a steroid injection. The doctor noted that Plaintiff was left with osteoarthritis in his knee, particularly in the medial compartment, and discussed various treatment options. (Tr. 350.) In September, Plaintiff told Dr. Rushford that the injection lasted only one day and he was having difficulty with steps and walking. Dr. Rushford gave him an injection of Synvisc and fitted him with a hinged knee brace. He prescribed Naproxen. He hoped that Plaintiff could return to work at the end of October. He noted that, if Plaintiff continued to have discomfort and his pain could be well localized, he might consider a unicompartmental knee replacement. (Tr. 352-56.)

When Plaintiff returned to Dr. Rushford on October 31, 2013, he told the doctor that he still had discomfort over the medial aspect of the right knee and was thinking about pursuing a knee replacement. He also said that he had memory issues from striking his head in the past, and he was "pursuing disability" because of his knee and his memory issues. Dr. Rushford told him he was not "comfortable with placing him on disability following a knee arthroplasty." He wrote, "I do not believe that he is total[ly] disabled as a result of his knee injury." (Tr. 357.)

Plaintiff saw primary care physician David Walls throughout the period in issue. In November 2013, Plaintiff complained of right knee pain and said he wanted a second opinion on surgery. (Tr. 468,)

On Dr. Walls' referral, Plaintiff saw Dr. Steven Horner, an orthopedic surgeon, in November 2013. This was his only visit with this doctor. He complained of pain in both knees, worse on the right. On exam, both knees had normal alignment and stability. Range of motion

6

was completely full in both knees with no crepitus. There was very mild tenderness to palpation along the medial side of the right knee. X-rays were normal. The diagnosis was mild degenerative arthritis of the right knee. Dr. Horner injected his right knee with a steroid solution and referred him for physical therapy. He wrote that it was "extremely premature to consider a knee replacement." He advised against any surgical intervention. He gave Plaintiff a slip to return to work on December 2, 2013. (Tr. 367-69.)

Plaintiff saw Dr. Rushford again in January 2014. He complained of continued pain in his right knee. X-rays of the right knee showed moderate osteoarthritis but not "bone on bone." On exam, extension was full and flexion was greater than 110 degrees. The right knee was stable with no warmth or effusion and no focal tenderness. Dr. Rushford gave him a steroid injection. He noted that, if Plaintiff's pain persisted, he might consider a total knee replacement. In April 2014, Plaintiff reported that the injection gave him only brief relief. He was prescribed a topical anti-inflammatory medication. (Tr. 513-25.)

Dr. Rushford left the practice, so Dr. Thomas Meyer took over Plaintiff's care. Dr. Meyer ordered an MRI of the right knee, which was done in June 2014. This showed no recurrent meniscal tear, but there was grade 4 chondromalacia of the patellar area and in the medial compartment to a lesser degree. Dr. Meyer stated that "it appears this is all due to his early osteoarthritis in the knee." He ordered a medial unloading knee brace and prescribed Norco. (Tr. 534-41.)

In September 2014, Dr. Meyer recommended that Plaintiff get another opinion "due to the mismatch between the subjective symptoms and the x-ray findings." (Tr. 527.)

Plaintiff saw an orthopedic surgeon at Washington University in St. Louis, Missouri, later

7

that month. Dr. Barrack noted that an MRI confirmed "much more substantial wear and irritation in the patellofemoral joint compared to those seen on his x-ray." On exam, his gait was nonantalgic and his knee had only very mild effusion. He had pain with compression of the patellofemoral joint and notable crepitus with range of motion. He was thought to be a candidate for knee replacement and was to see Dr. Nunley for evaluation. (Tr. 653-54.) Dr. Nunley performed a total knee replacement on November 14, 2014. (Tr. 620.)

Plaintiff had physical therapy following the surgery. In March 2015, he had minimal pain but extension (*i.e.*, straightening the knee) was limited. He was to continue physical therapy and to use a home dynamic stretching device. (Tr. 589.) In October 2015, almost one year after the surgery, Plaintiff was "doing much better." He told Dr. Nunley that he was riding a bike for 3 to 4 miles a day and he had used a jackhammer "all day on Sunday." He was walking normally and was "very satisfied." Dr. Nunley recommended that he stay active and return in 5 years. (Tr. 575.)

Plaintiff fell from a ladder on November 1, 2015. He was seen in the emergency room and diagnosed with a compression fracture at L1. He saw an orthopedic specialist, Dr. Boynick, the next day. Dr. Boynick agreed that he had a chip fracture of L1. He noted that Plaintiff's back pain was resolving and cleared him for activities as tolerated. (Tr. 894-96.)

Plaintiff saw his primary care physician, Dr. Walls, on January 7, 2016. He complained of pain in the right knee and back. On exam, he had swelling of the right knee with prepatellar tenderness and decreased range of motion. He also had tenderness of the lumbar spine with decreased range of motion. Gait and station were normal. (Tr. 1172-74.)

### 4. Dr. Walls' Opinion

Dr. Walls assessed Plaintiff's ability to do work-related activities by filling out a form at the request of Plaintiff's counsel in January 2016. (Tr. 1170-71.) He indicated that Plaintiff was not capable of sustained walking/standing or sitting. He was able to lift and carry up to ten pounds and was able to use both upper extremities for frequent reaching, pushing, pulling, and manipulating. He also indicated that Plaintiff would not need any rest periods during a workday.

### 5. State Agency Consultants' Opinions

State agency consultants assessed Plaintiff's RFC based on a review of the file materials in February and September 2014. (Tr. 98-101, 108-11.) Both consultants agreed that he was capable of light work with some physical limitations and that he was able to perform his past work as a beer bottler.

## Analysis

Plaintiff argues, correctly, that the ALJ failed to properly consider whether he was entitled to a closed period of disability from his right knee injury in May 2013 through at least October 2015.

In the ALJ's view, Plaintiff recovered from his arthroscopic knee surgery well enough to return to work for some period, but, when an MRI showed "additional degenerative changes of the knee," he underwent a total right knee replacement in November 2014. He also suggested that Plaintiff's knee problems were pretty much resolved by October 2015, less than one year later. (Tr. 34.) Although the discussion is not explicit, the ALJ apparently concluded, based on this reasoning, that Plaintiff was not entitled to a closed period of disability.

"The law defines disability as the inability to do any substantial gainful activity by reason

9

of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). An applicant is entitled to a period of disability if he has or had a disability as defined in § 404.1505, he was insured for disability at the relevant time, he filed a timely application, and "at least 5 consecutive months go by from the month in which your period of disability begins and before the month in which it would end." 20 C.F.R. § 404.320(b).

Although the ALJ did not explicitly say so, his conclusion that Plaintiff was not entitled to a period of disability must necessarily be premised on the belief that Plaintiff was able to do some kind of full-time work between his recovery from the arthroscopic surgery and the September 2014 MRI. However, he ignored medical evidence indicating that Plaintiff's knee problems were ongoing throughout the period and the "additional degenerative changes" shown on the later MRI were present all along.

The ALJ failed to acknowledge that Dr. Rushford pointed out at the first postoperative visit that Plaintiff still had osteoarthritis in his right knee following the arthroscopic surgery. He also failed to note that, as early as September 2013, Dr. Rushford mentioned the possibility of a knee replacement if Plaintiff continued to have discomfort and his pain could be well localized. Instead, he honed in on Dr. Rushford's remark in October 2013 that he would not feel comfortable placing Plaintiff on disability because of arthroscopy.

The ALJ also honed in on the one-time visit with Dr. Horner in November 2013, noting that Dr. Horner said he could return to work in early December 2013. He completely ignored the fact that Plaintiff continued to have pain such that Dr. Rushford gave him a steroid shot in January 2014, and noted that, if Plaintiff's pain persisted, he might consider a total knee replacement.

10

The ALJ also ignored the fact that, when Plaintiff saw an orthopedic surgeon at Washington University in September 2014, that doctor noted that an MRI confirmed "a much more substantial wear and irritation in the patellofemoral joint compared to those seen on his x-ray." (Tr. 653-54.) The total knee replacement was done in November 2014.

While it is true that an ALJ is not required to discuss every piece of evidence in the record, it is well-established that an ALJ "may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) (collecting cases). Here, the ALJ failed to analyze the evidence cited above which suggests that, rather than being two discrete periods of incapacitation because of knee pain, the osteoarthritis that necessitated the knee replacement was present all along, and that Plaintiff never "recovered" after the arthroscopic surgery to the point where he could have returned to work before the knee replacement. This is, of course, not to say that the evidence compelled that conclusion. However, the ALJ was required to fairly consider the medical evidence that tended to support Plaintiff's claim as well as the evidence that did not.

The Court also agrees that the ALJ erred in his consideration of Dr. Walls' opinion. The ALJ gave that opinion "limited weight" because the limitations Dr. Walls assigned were "excessive" in light of the objective evidence, including his own findings. (Tr. 39.) However, the ALJ's failure to consider all of the medical evidence obviously undermines that analysis. Further, the ALJ apparently did not consider the fact that the various specialists who treated Plaintiff furnished Dr. Walls with copies of their records, giving him a view of the complete treatment picture. *See* 20 C.F.R. § 404.1527(c)(6) (noting that "the extent to which a medical source is familiar with the other information in your case record" is a relevant factor in deciding

how much weight to afford to a medical opinion).

The ALJ's errors require remand. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Plaintiff was disabled during the relevant time or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of Court is **DIRECTED** to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**
**DATE: May 31, 2018**

                                s/ J. Phil Gilbert
                                **J. PHIL GILBERT**
                                **UNITED STATES DISTRICT JUDGE**